MEMO ENDORSED

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

May 21, 2020

**VIA ECF**
Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

Re:   **United States v. Douglas Castle**
      **18 Cr. 531 (KMK)**

Dear Judge Karas,

      We write in reply to the government's response to Mr. Castle's request for compassionate release pursuant to 18 U.S.C. § 3582(c). See Dkt. Nos. 44 ("Def. Br."), 45 ("Gov't Br."). Allowing Mr. Castle to complete the remainder of his sentence on home confinement is an appropriate response to the extraordinary circumstances brought on by COVID-19. Mr. Castle's medical conditions elevate his risk for severe illness if he contracts the virus and the conditions at the Camp at Fort Dix prevent him from adequately protecting himself. The fact that his conditions are "not uncommon," as the government labels them (Gov't Br. 1), does not undermine the risks that they pose to Mr. Castle's health. Given Mr. Castle's individual circumstances and the fact that he has a safe place to live on home confinement, the Court should grant Mr. Castle's motion.

      Much has changed since this Court sentenced Mr. Castle in December 2018. In the United States, COVID-19 has killed at least 93,000 people and infected over 1.5 million.[1] In New Jersey alone, where Mr. Castle is incarcerated, it has infected more than 150,000 people and killed more than 10,700.[2] And those numbers grow every day. Indeed, there have been more than 1500 deaths since Mr. Castle filed his initial motion twelve days ago. See Def. Br. 7.

---

[1] Coronavirus Map: Tracking the Global Outbreak, N.Y. Times, May 21, 2020, available at https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html.

[2] New Jersey COVID-19 Dashboard, available at https://covid19.nj.gov/#live-updates.

As those numbers have risen, so too have the number of cases inside the Bureau of Prisons. Every day that Mr. Castle remains in prison is a dangerous one.

| Date | Positive Inmates | Positive Staff | Inmate Deaths | Total BOP Cases[3] |
|---|---|---|---|---|
| 4/8/2020 (Date of Mr. Castle's Request to Warden) | 272 | 105 | 8 | 377 |
| 5/19/2020 | 2298 | 198 | 57 | 2496 |

<u>There are extraordinary and compelling circumstances to support release.</u>

The parties agree on the applicable legal standard. The Court "may reduce the term of imprisonment ... after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that ... (a) extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A). Indeed, Judge Seibel recently held that, "[u]nder 18 U.S.C. § 3582(c)(1)(A), I may, after considering the factors set forth in 18 U.S.C. § 3553(a), reduce a sentence if extraordinary and compelling reasons justify such action and it is consistent with the relevant policy statements of the Sentencing Commission." United States v. Venice, 17 Cr. 89 (CS), Dkt. No. 1009 (S.D.N.Y. May 7, 2020).

The United States Sentencing Guidelines' Application Notes to Section 1B.13 describe "four potential extraordinary and compelling reasons," id., including a catchall fourth category: "an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B.13, cmt. n.1(D). It is pursuant to this fourth, "catchall" category that Mr. Castle is entitled to relief. See, e.g., Venice, supra (granting compassionate release for a defendant who "does not suggest he meets any of the first three categories, but argues that the risk the corona virus pandemic poses to one with his health conditions meets the fourth category"); United States v. Millan, 91 Cr. 685 (LAP), Dkt. No. 1060 (S.D.N.Y. Apr. 6, 2020) (finding "the legislative history of 18 U.S.C. § 3582(c)(1)(A) indicates that lawmakers thought that 'extraordinary and compelling reasons' for a sentence reduction should not be limited to medical condition, age, and family circumstances" and granting compassionate release).

<u>FCI Fort Dix is not a safe place for Mr. Castle.</u>

In opposing Mr. Castle's motion, the government argues that "[t]he BOP generally and Fort Dix specifically are actively managing the risks presented by COVID-19." Gov't Br. 9. In doing so, it points to 'phase one' plans created by the BOP in 2012, before coronavirus ever existed. Gov't Br. 9. Then the government describes in great detail the subsequent phases that were implemented. Id. 9-11. The government's arguments regarding the BOP's efforts fail for two reasons.

---

[3] Numbers obtained from www.bop.gov/coronavirus on a daily basis.

First, despite the plans touted by the government, the number of cases within federal prisons has grown exponentially. On the day Phase Four was implemented (March 26, 2020), Gov't Br. 10, there were 6 positive inmates and zero inmate deaths.[4] On the day Phase Five was implemented (April 1, 2020), id., there were 57 positive cases and 3 inmate deaths. On the day Phase Six was implemented (April 13, 2020), id., there were 388 positive cases and 13 inmate deaths. On the day testing was expanded (April 23, 2020), id., there were 620 positive cases and 24 inmate deaths. Today, there are 2767 positive inmates and 59 inmate deaths.[5] In short, the BOP does not have this under control. Regarding the Camp at Fort Dix specifically, 28 percent of the population became infected with COVID-19 after Phase Six as well.[6] The action plan the government relies on as proof that the BOP's efforts are working in fact demonstrates precisely the opposite.

Second, the government is responding to the wrong question. At issue in Mr. Castle's application is not whether "the BOP has taken the threat seriously" or whether it has "instituted extraordinarily protective measures." Gov't Br. 10. The question is whether or not Mr. Castle remains in danger notwithstanding the BOP's efforts, given his age and medical conditions. The answer is clear: the danger persists. See, e.g, United States v. Cooper, 08 Cr. 356 (KMK), Dkt. No. 181 (S.D.N.Y. Apr. 28, 2020) ("While the MDC has undertaken substantial steps to address the spread of COVID-19, it is undeniable that the risks of spreading the disease are inevitably higher in a prison setting, where social distancing is much more difficult."); United States v. Pagliuca, 17 Cr. 432 (CS), Dkt. No. 63 (S.D.N.Y. May 18, 2020) ("of course anyone in an institution where social distancing is not possible – be it a prison, an aircraft carrier or a nursing home – is by definition at increased risk").

Still, the government maintains that "Castle's risk of exposure to the coronavirus at the Camp is low." Gov't Br. 12. But, Fort Dix is located in Burlington County where there are 4097 cases and 249 deaths (an increase of 900 and 100, respectively, in the last two and a half weeks).[7] Staff members continue to cycle in and out of the facility daily. "FCI Fort Dix is already experiencing a serious outbreak of COVID-19, with an infection rate that far exceeds the state of New Jersey as a whole." Declaration of Nina Fefferman, Ph.D.[8] Even at the neighboring low-security facility, where there have been zero reported cases, Courts have found that the risks to medically vulnerable inmates are real. See, e.g., United States v. Fazio, 11 Cr.

---

[4] Numbers obtained from www.bop.gov/coronavirus on a daily basis.

[5] BOP Website, available at https://www.bop.gov/coronavirus/.

[6] 58 out of a population of 207, see https://www.bop.gov/locations/institutions/ftd/. (If the government is correct that the population is 124, Gov't Br. 11, then forty-seven percent of the population was infected.)

[7] New Jersey COVID-19 Dashboard, available at https://covid19.nj.gov/#live-updates (comparing May 21 to May 4, 2020 data).

[8] Attached as Exhibit 1 to Complaint, Wragg v. Ortiz, 20 Cv. 5496, Dkt. No. 1 (D.N.J. May 4, 2020) ("Fefferman Decl.").

873 (ER), Dkt. No. 329 (S.D.N.Y. May 15, 2020) (releasing 74-year-old with serious medical conditions from the low-facility at Fort Dix); United States v. Pagliuca, supra (releasing 68-year-old with serious medical conditions from the low-facility at Fort Dix "given the increased risks to his health presented by continued imprisonment").

There is simply no question that Mr. Castle's home is safer than Fort Dix. "Prisons are tinderboxes for infectious disease." See United States v. Jeremy Rodriguez, No. 03 Cr. 271 (AB), Dkt. No. 135 (E.D. Pa. Apr. 1, 2020) (granting inmate's compassionate release motion and collecting research explaining the greater risk of infectious disease spread in detention facilities). While we are glad to hear that Mr. Castle sleeps 6 feet away from others, he remains in an open dormitory setting, where the air circulates among all 65 people. Moreover, the space is communal. Gov't Br. 12. Every surface—for living and eating and using the bathroom—is touched by an entire group of people. Indeed, coronavirus "is thought to spread mainly from person-to-person" and, therefore, the CDC advises that during this pandemic, "the best way to prevent illness is to avoid being exposed to the virus."[9] Inside FCI Fort Dix, that is impossible.[10] Experts concluded that at FCI Fort Dix, "the current efforts are epidemiologically insufficient to protect inmates, prison staff, or the general public surrounding the prison."[11]

Despite these undisputed facts, the government argues that Mr. Castle's 2-bedroom, 2-bathroom, 1200 square foot condominium that he shares with one other adult (his wife), is no safer than jail. Gov't Br. 12. Mr. Castle's wife, Ming Chan, informs counsel that Mr. Castle will quarantine himself in the second bedroom, for the safety of both of them; she will shop for all necessary groceries; and they will both will wear proper personal protective equipment (PPE) when attending necessary medical appointments. The suggestion that this living arrangement is the same as living in a communal setting for 24-hours a day, where surfaces are touched by 65 men at a time, cleaning supplies are meted out by correctional authorities, and workers from the community cycle in and out on each shift, strains credulity. That Mr. Castle's home is located in a community with some cases of coronavirus—i.e. like communities all over the planet—is not determinative of anything.[12]

The government argues that at home, the "highly controlled environment at Fort Dix Camp" is safer than Mr. Castle "living and making his own outpatient medical appointments in ... [the] community." Gov't Br. 12. That is wrong. If released, Mr. Castle will be placed on home detention. As such, the Probation Office will ensure that Mr. Castle's movements are

---

[9] Id.

[10] The Warden of Fort Dix specifically acknowledged: "Social distancing is not possible in this environment." See Press Release, ACLU of New Jersey, available at https://www.aclu-nj.org/news/2020/05/04/medically-vulnerable-people-federal-prison-file-class-action.

[11] Fefferman Decl., supra.

[12] The government said there are 227 cases in Somers, NY, but failed to note that only 54 of those cases are "active"). Citing to https://www.somersny.com/resources/coronavirus-statistics-2. (Notably, Somers, NY has a similar rate of infection as Burlington County, NJ.)

4

"highly controlled" 24 hours per day, 7 days a week, via the constant surveillance provided by an electronic ankle monitor. Mr. Castle will need to seek permission to even go to the doctor. Therefore, authorities will, in fact, retain control over Mr. Castle's every movement.

Finally, the government argues that Mr. Castle's wife's occupation as a nurse weighs against his release. Gov't Br. 12. To suggest that the family members of healthcare workers should be subjected to a different level of punishment (jail) precisely because their loved ones are serving an essential function in our communities is simply offensive. Moreover, as a healthcare professional, Ms. Chan is eminently cognizant of the safety precautions required during this time. She has described to counsel that, in addition to wearing all the necessary protective equipment during her shifts, she goes through a decontamination ritual before leaving the hospital. She does so for her own safety, her patients' safety, and her community's safety. If Mr. Castle is released, these precautions will protect him, too. Like many of her healthcare worker-brethren, she will also sleep in a separate room from him, to ensure everyone's safety.

<u>Mr. Castle's serious health problems make him high-risk for life-threatening consequences from COVID-19.</u>

The government points out that in 2018, Mr. Castle's "defense sentencing memorandum did not portray Castle as elderly or physically ailing, and did not even mention any of the physical ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ now being proffered by Castle as 'extraordinary and compelling reasons' for compassionate release during the COVID-19 pandemic." Gov't Br. 6. But that is exactly the point: the world is different now than it was at Mr. Castle's sentencing. Mr. Castle did not make this motion in a pre-pandemic world. The COVID-19 pandemic has created new risks for all of us—and especially for people with particular medical conditions. There is no question that Mr. Castle is one such person.



It is the <u>combination</u> of Mr. Castle's individual circumstances that enable him to satisfy the legal standard. In <u>United States v. Cooper</u>, 08 Cr. 356 (KMK), Dkt. No. 181 (S.D.N.Y. Apr. 28, 2020), this Court granted compassionate release, explaining: "it is the <u>combination of these medical conditions, plus the fact</u> that [the defendant] is now in his 50s that places him in a higher risk category." <u>Id.</u> (emphasis added). The Court found that age, plus "hypertension, obesity ... and diabetes are high risk comorbidity factors. <u>Id.</u> The same is true here: Mr. Castle's age and medical conditions place him in multiple, overlapping high-risk categories.

5

Age

The government does not—because it cannot—rebut the undisputed guidance from the Center for Disease Control (CDC) that older adults are "at higher risk for developing more serious complications from COVID-19 illness."[13] Instead, the government argues that age "alone" is not sufficient for compassionate release. Gov't Br. 13. Yet, Mr. Castle is not arguing that age "alone" entitles him to relief. Def. Br. 13. The fact that Mr. Castle is about to turn 69 is a valuable factor in the consideration of his combination of conditions.

Medical conditions



---

[13] CDC Website, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[14] The BOP similarly applied a standard that is too narrow. Despite counsel's assertions to the contrary, Fort Dix requires its applicants to fall into one of the categories outlined in BOP Program Statement 5050.50. See Exhibit A, April 17 Correspondence. Ultimately, Fort Dix denied Mr. Castle's application because he failed to meet the criteria of the Program Statement. See Exhibit B, Warden Letter.

[15]

6



---

[16] Id.

[17] Id.

[18] Id.



The statutory goals of sentencing are accomplished by the requested sentence.

Finally, the government argues that Mr. Castle's motion should be denied because of the severity of his offense conduct. Gov't Br. 16-17. The government repeats the arguments it made at sentencing, in advocating for a guidelines sentence of 63 to 78 months. Id. at 6. While there is no question this Court intended to punish Mr. Castle with a substantial jail sentence, ultimately the Court varied downward. Mr. Castle accepted responsibility and expressed remorse to the Court before his sentencing.

Mr. Castle acknowledges that he has only served approximately one-third of his incarceratory sentence to date. But the fact that his case took place closer in time to the coronavirus pandemic than others' should not be dispositive. Indeed, there is no magic number or percentage that a person must serve in jail to be released during this crisis. For example, in



[26] Id.

United States v. Stahl, 18 Cr. 694 (RA), Dkt. Nos. 59-65 (S.D.N.Y. Apr. 20-22, 2020) the BOP decided to release an inmate who had served only 23% of his sentence. Then, it attempted to reverse course when new guidelines were issued advising that inmates must meet a minimum bar of 50% of their sentences. Id. The BOP then reverted to its original determination and Stahl was released, despite having served a lower percentage of his sentence than Mr. Castle. Id. Similarly, Paul Manafort was released by the BOP last week after serving 29% of his prison sentence[27]—the exact same proportion as Mr. Castle.

During the more than 14 months he has spent in prison to date, Mr. Castle's likelihood of recidivism has only declined, and his record has only improved. Indeed, the BOP placed him in a camp facility because of their own assessment of the low risk of danger he posed. His clean disciplinary record indicates that he can follow the law going forward. Doing well in prison is an important way of demonstrating to the Court that he has learned from his incarceratory sentence. Before the pandemic, Mr. Castle was engaged in BOP programming and was working as a library clerk. These rehabilitative efforts further demonstrate that the statutory goals of sentencing have been met.

Since the pandemic struck, however, all programming has ceased. At the same time as rehabilitation tools are being denied to inmates, the punitive aspects of Mr. Castle's time in jail have skyrocketed, particularly given the isolation, risk, and fear that accompany being incarcerated during this crisis. See United States v. Pena, 15 Cr. 551 (AJN), Dkt. No. 340 (S.D.N.Y. May 8, 2020) (recognizing that the punishment defendants are currently enduring is much harsher than anticipated when they were sentenced and holding "[t]he time [Pena] has served in prison has already achieved much of the original sentence's retributive, deterrent, and incapacitative purpose"). As such, the goals of Mr. Castle's incarceratory sentence have been achieved.

The government cautions that home confinement "would create a significant opportunity for re-offense," Gov't Br. 17. But that argument fails to recognize that Mr. Castle was on pretrial supervision for almost a year without incident. Def. Br. 15. That achievement can give the Court confidence that Mr. Castle can successfully complete a term of home confinement and meet his obligations to the Court.

When choosing the appropriate length of imprisonment, the Court could not have anticipated the outbreak of a pandemic. Today, that crisis, coupled with his age and medical conditions, has endangered Mr. Castle's life, and will continue to do so unless he is granted compassionate release.

---

[27] Mr. Manafort was detained on June 15, 2018; he was scheduled to be released on November 4, 2024; he was released to home confinement on May 13, 2020. See Sharon LaFraniere. Judge Orders Paul Manafort Jailed Before Trial, Citing New Obstruction Charges (June 15, 2018), available at https://www.nytimes.com/2018/06/15/us/politics/manafort-bail-revoked-jail.html; Katherine Faulders et al. Former Trump campaign chairman Paul Manafort released to home confinement amid coronavirus concerns (May 13, 2020), available at https://abcnews.go.com/Health/trump-campaign-chairman-paul-manafort-released-home-confinement/story?id=70642927.

Conclusion

For the reasons detailed above and in his initial motion, the Court should immediately grant Mr. Castle's motion.

Respectfully submitted,

/s/
Sylvie Levine
Counsel for Mr. Castle

---

The application for compassionate release, under 18 U.S.C. Section 3582, is denied. Mr. Castle does indeed suffer from some medical ailments that increase his risk from the coronavirus and he is at the low end of the age range that also presents higher risks. However, those risks will go whereever Mr. Castle goes, whether in prison or in Somers. And, while it may be true that prison facilities face greater challenges in controlling the spread of the virus, and BOP facilities are not exempt from this, the Fort Dix Camp where Mr. Castle is housed has undertaken substantial measures to minimize the risk to its inmates, thus making Mr. Castle's reliance on statistics for all BOP facilities and the other wings at Fort Dix misplaced. The camp is operating well below its capacity, the result of both the discharge of some inmates to home detention and the refusal to take new prisoners since early March. Thus, while the Court recognizes that Mr. Castle is dealing with some medical challenges, they are being treated and he is in a facility that has undertaken great efforts to minimize the risk of exposing the inmates at that facility. Put another way, Mr. Castle has not offered compelling or extraordinary reasons for his early release.

Moreover, evaluation of the Section 3553(a) factors cuts against his early release. Mr. Castle has a troubling criminal history and his calculated conduct in this case was nothing short of reprehensible, even if not violent. Vulnerable people were financially ruined by Mr. Castle's greedy schemes. To release Mr. Castle, after serving barely over a quarter of his sentence, would dilute the respect for law and other reasons for the Court's initial sentence, thus distinguishing this case from Cooper, who had served nearly three-quarters of his sentence.

For these reasons, the application is denied, but without prejudice should the circumstances materially change.

So Ordered.

5/28/20